NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190703-U

NO. 4-19-0703

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 6, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Z.A., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 18JA31 |
| v. | ) | |
| Stefani S., | ) | Honorable |
| Respondent-Appellant). | ) | John R. Kennedy, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Knecht and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the trial court did not err in terminating the wardship of the minor and closing the neglect case.

¶ 2    In April 2018, the State filed a petition for adjudication of neglect on behalf of Z.A. (born January 2014), the minor child of respondent, Stefani S. On May 15, 2018, the trial court found Z.A. was neglected. The next month, the court determined respondent and Terence A., Z.A.'s father, were unfit and made Z.A. a ward of the court, assigning custody and guardianship to the Department of Children and Family Services (DCFS).

¶ 3    Following an October 2019 permanency review hearing, the trial court determined it was in Z.A.'s best interests to terminate the wardship, return guardianship to Terence A., who had previously been given custody by the court, and close the neglect case.

¶ 4    On appeal, respondent argues the trial court erred in terminating the wardship and closing the case. We affirm.

¶ 5                                    I. BACKGROUND

¶ 6                      A. The Petition, Adjudication, and Disposition

¶ 7    On April 3, 2018, the State filed a petition for adjudication of neglect on behalf of Z.A., alleging her environment was injurious to her health in that it exposed her to (1) substance abuse (count I) and (2) domestic violence (count II). 705 ILCS 405/2-3(1)(b) (West 2018). According to the shelter-care report, DCFS became involved after receiving reports respondent "was using crack cocaine and acting erratically around [Z.A.]" and "was battered" by Terence in front of Z.A. See *In re Z.A.*, 2018 IL App (4th) 180471-U, ¶¶ 5-8 (discussing the shelter-care report in greater detail). At the shelter-care hearing, respondent and Terence agreed to the entry of an order placing temporary custody of Z.A. with DCFS. At the adjudicatory stage, the parties stipulated to count II, and on May 15, 2018, the trial court entered an order finding Z.A. was neglected.

¶ 8    On June 12, 2018, the trial court conducted the dispositional hearing. The State presented no evidence, relying instead on the dispositional report, which indicated the primary concerns about respondent's ability to parent included "her significant history of illicit substance use ('crack,' cocaine), suspected prostitution, her extremely limited parenting abilities, and the inability to place the needs of [Z.A.] first (particularly regarding safety)." The primary concerns with respect to Terence included "his lack of involvement in providing primary care to [Z.A.], his lack of demonstrated ability/willingness to provide protection to his daughter until the current DCFS involvement, and his marijuana use since the DCFS involvement in response to stress." Given these concerns, the report recommended custody and guardianship be placed with DCFS,

with a permanency goal of "Return Home in 12 Months." The trial court determined respondent and Terence were unfit and unable to care for Z.A. and entered an order adjudicating her neglected, making her a ward of the court, and placing custody and guardianship with DCFS. (Terence appealed the court's dispositional order, and this court affirmed. *Z.A.*, 2018 IL App (4th) 180471-U, ¶ 1.)

¶ 9                                    B. The Permanency Reports and Orders

¶ 10        To achieve the permanency goal, respondent's service plan included, in relevant part, the following objectives: (1) abstain from drugs and alcohol and complete all recommended substance abuse treatment, (2) take parenting classes and employ the tools learned during visitation, and (3) learn to interact without violence and avoid relationships that could expose Z.A. to harm or the threat of harm. Terence's service plan required him to complete the following objectives: (1) abstain from alcohol and drugs, (2) complete a domestic violence assessment and all recommended services, and (3) provide safe and adequate housing. The trial court reviewed each parent's progress toward reunification five times over a period of 13 months before ultimately terminating the wardship and closing the case. The first review took place in September 2018.

¶ 11                                    1. *September 2018*

¶ 12        The first permanency report indicated respondent completed a substance abuse assessment and was recommended for "intensive outpatient" treatment once a week. She attended two sessions in August and none in September. She refused to submit to a drug test three times and tested positive for alcohol during a visit with Z.A.—at approximately 9 a.m.— after being swabbed due to the smell of alcohol on her breath. Respondent completed anger management treatment but continued to get "profusely upset and unable to effectively

communicate." During an unannounced home visit, respondent's caseworker observed a man in respondent's bed, whom she identified as Anthony Brown; when Brown awoke, he was "stumbling, slurring his words, and using the wall and car as a support." Respondent's mother reported respondent was engaged to Brown and when respondent and Brown visited her in August 2018, they appeared intoxicated and had open alcohol containers in their vehicle. Respondent completed parenting classes but frequently had to receive parenting support during visits with Z.A. Respondent visited with Z.A. for three hours once a week at the Children's Home and Aid (CHA) office. The visits generally went well, although she missed or was late to several.

¶ 13     Terence completed a substance abuse assessment and "did not qualify for any treatment recommendations." All of his drug tests were negative. He also completed a domestic-violence assessment and was referred for classes, which he attended regularly. He lost his job due to the neglect case and was "actively pursuing employment." Terence lived with his paramour, Carolyn Dyer, in a two-bedroom apartment determined to be safe for Z.A. He visited Z.A. at the CHA office for three hours once a week. The visits went well and "a bond has been observed."

¶ 14     The trial court found respondent had made reasonable efforts but not reasonable and substantial progress toward reunification, while Terence had made reasonable efforts and reasonable and substantial progress. Custody and guardianship continued with DCFS. DCFS was given discretion to implement third-party supervision of Terence's visits.

¶ 15                              2. *December 2018*

¶ 16     The second permanency report indicated respondent missed seven substance abuse sessions. She also tested positive for cocaine twice. Due to continued concerns with her

"aggressive behavior and inability to manage emotions," respondent was recommended for domestic violence and additional anger management treatment. Her parenting techniques improved, but she still needed occasional guidance and was recommended for an additional parenting class. Respondent's visits with Z.A. were reduced to two hours "due to her positive drug screen, lack of communication, and non-participation in services." However, the visits continued to go well. The prognosis for reunification was "guarded" due to concerns respondent was being dishonest about her paramours and "actively using cleansers to skew her drug screens."

¶ 17        Terence attended all of his domestic violence classes and did not fail any drug tests. He also attended all of his visits with Z.A., which reportedly went well. Terence remained unemployed and continued to reside with Dyer. The court-appointed special advocate (CASA) report recommended custody and guardianship remain with DCFS.

¶ 18        The trial court found respondent had made reasonable efforts and reasonable, but not substantial, progress toward reunification, while Terence had made reasonable efforts and reasonable and substantial progress. Custody and guardianship continued with DCFS.

¶ 19                              3. *March 2019*

¶ 20        During the third reporting period, respondent consistently attended her substance abuse sessions. She tested positive for cocaine once, refused one drug test, and failed to appear for two. Respondent attended fewer than half of the domestic violence classes. She also reported being engaged to and living with Josh McNeil. The visits with Z.A. went "really well" and there was "an apparent bond." However, the visits continued to occur at the CHA office due to the lack of stability in respondent's life. Z.A.'s counselor concluded it would be "traumatizing and

confusing" for her to go to respondent's home "before [she] has stabilized." The prognosis for reunification was "guarded" due to "concerns about [respondent's] overall stability."

¶ 21        Terence again tested negative for all substances, and the frequency of the testing decreased as a result. He consistently attended domestic violence classes and was set to graduate in the near future. In February 2019, Terence began working 20 hours per week. Visitation was moved from the CHA office to Terence's home and increased to six hours each week, with Dyer serving as the third-party supervisor. Terence's caseworker "noticed an increase in the quality of visits since being transitioned into the home." The caseworker also observed a bond between Z.A. and Dyer. The prognosis for reunification was "positive." The CASA report again recommended custody and guardianship remain with DCFS.

¶ 22        The trial court found respondent had made reasonable efforts but not reasonable and substantial progress toward reunification, while Terence had made reasonable efforts and reasonable and substantial progress. Custody and guardianship continued with DCFS. DCFS was given the discretion to implement unsupervised visits between Terence and Z.A.

¶ 23                                4. *June 2019*

¶ 24        During the fourth reporting period, respondent attended only four substance abuse sessions and was "at risk of being unsuccessfully discharged because of her attendance." She refused one drug test and failed to appear for five. She was unsuccessfully discharged from domestic violence treatment due to inconsistent attendance and her "erratic behavior," but she did complete the parenting classes and was not referred for additional education. Respondent reported living with her paramour, Ronald Ward. The visits with Z.A. continued to go well but remained at the CHA office and had not been increased "because of [respondent's] lack of stability, unsuccessful discharge from domestic violence services, and poor attendance at

substance abuse." Respondent's mother also reported respondent had stated her intention to kidnap Z.A. However, respondent denied the report, saying her mother was "mentally unstable." The prognosis for reunification was "poor" due to respondent's poor attendance at treatment and numerous failures to appear for drug tests.

¶ 25        Terence tested negative for all substances and was successfully discharged from domestic violence treatment. He was "accepted into The University of Illinois Champaign-Urbana's graduate social work program." In April 2019, Z.A.'s foster parent moved out of Illinois and Z.A. returned home to Terence and Dyer instead of being placed "into traditional care." The caseworker visited the home unannounced several times and had "no concerns with [Terence's] and Ms. Dyer's ability to safely care for [Z.A.]" Z.A. reported being happy living in the home. Terence enrolled her in therapy to help with the transition.

¶ 26        The trial court found respondent had made reasonable efforts but not reasonable and substantial progress toward reunification, while Terence had made reasonable efforts and reasonable and substantial progress. The court found it was in Z.A.'s best interests to return custody to Terence. Guardianship continued with DCFS.

¶ 27                                            5. *October 2019*

¶ 28        During the final review period, respondent was unsuccessfully discharged from substance abuse treatment. She reengaged the following month and thereafter attended sessions regularly. She reported smoking crack cocaine on September 30, 2019, and tested positive for cocaine and marijuana. Respondent and Ward were briefly engaged until the relationship ended in July 2019. DCFS "offered [respondent] her final parent child visit on June 28, 2019." Due to her inability to visit Z.A., respondent "disengaged in all services and stopped returning phone calls and texts from [her case]worker [in] the month of July." She reengaged in August, but her

caseworker noted she "does not think [respondent] is being honest with her services and relationship statuses." Respondent was also arrested in August. The prognosis for reunification remained "poor" given respondent's inability to remain sober and her "many unhealthy romantic partners."

¶ 29        Terence continued to test negative for all substances. Z.A. was "thriving" in Terence's home and appeared "safe, happy, and healthy" during each unannounced home visit. The caseworker noticed "significant improvement in [Z.A.] since being placed in [Terence's] care full time." Terence "show[ed] that he can care for all of [Z.A.'s] needs. He enrolled her in school, enrolled her in counseling ***, signed her up for gymnastics, and takes her to all medical appointments." He indicated he would be willing to facilitate a relationship between respondent and Z.A. "once she successfully completes substance abuse treatment, mental health services, test[s] clean, and is stable."

¶ 30        The trial court found respondent failed to make reasonable and substantial progress toward reunification. Having determined respondent remained unfit and Terence remained fit, the court found it was no longer in Z.A.'s best interests to continue the wardship, reasoning as follows:

>"THE COURT: The really only remaining—the important issue is in regard to [Z.A.] [She] has a parent, her father, who's a fit, able and willing custodian I have determined before. He is also able to make the major decisions for life, education, etcetera, aspects of guardianship, make decisions of that nature in her best interest. And also I think is able to appropriately address the issues of contact through visitation with [respondent]. So as a result, it is a case where the court thinks that [Z.A.] is fine at home, doesn't need court intervention, and can

be successfully raised by her father. And so the guardianship of DCFS is vacated.

*** It is no longer in the best interest of [Z.A.] to be a ward of the court."

Accordingly, the court terminated the wardship, returned guardianship to Terence, and closed the case.

¶ 31        This appeal followed.

¶ 32                              II. ANALYSIS

¶ 33        Respondent argues the trial court erred in terminating the wardship. Specifically, she contends the court's "finding that the best interests of Z.A. no longer require wardship was against the manifest weight of the evidence, when Z.A. was in therapy to improve her relationships with her parents and when DCFS and [Terence] were prohibiting contact between Z.A. and [respondent]."

¶ 34        The purpose of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-2(1) (West 2018)) is to serve the best interests of the minor involved. To further this purpose, the Act's policy is to achieve permanency "at the earliest opportunity," and "preferably in [the minor's] own home." 705 ILCS 405/1-2(1) (West 2018); see also *In re V.M.*, 352 Ill. App. 3d 391, 397, 816 N.E.2d 776, 781 (2004) ("Whenever possible, everything must be done to return a child to the care and custody of a biological parent."); *In re D.L.*, 191 Ill. 2d 1, 13, 727 N.E.2d 990, 996 (2000) ("[I]t is not in [a minor's] best interests for [her] status to remain in limbo for an extended period of time."). Accordingly, the Act directs the trial court to terminate a wardship "[w]henever the court determines, and makes written factual findings, that health, safety, and the best interests of the minor and the public no longer require the wardship of the court." 705 ILCS 405/2-31(2) (West 2018). The trial court is in the superior position to determine whether wardship is in the minor's best interests and we will not disturb its finding unless it is against the

manifest weight of the evidence, meaning a review of the record clearly demonstrates the opposite result should have been reached. *V.M.*, 352 Ill. App. 3d at 397.

¶ 35 Here, the record does not clearly demonstrate it was in Z.A.'s best interests to remain a ward of the court; rather, the record clearly supports the trial court's finding. Z.A. needed permanence, and preferably in the form of reunification with a biological parent. Terence could provide that permanence. At the time the trial court terminated the wardship, Z.A. had been living with Terence for approximately six months. During that time, she was "thriving" and made "significant improvement." She reported being happy in the home and appeared "safe, happy, and healthy" during each unannounced home visit. Moreover, Terence "show[ed] that he [could] care for all of [Z.A.'s] needs. He enrolled her in school, enrolled her in counseling ***, signed her up for gymnastics, and [took] her to all medical appointments."

¶ 36 Conversely, respondent failed to demonstrate she was capable of caring for Z.A. due to her continued drug use and unhealthy, unstable relationships. Z.A. was initially removed from respondent's care due to her drug use and unhealthy relationships. Despite the need to remain sober, respondent consistently used drugs and alcohol throughout the duration of the case. She was unsuccessfully discharged from substance abuse treatment, had alcohol on her breath at a morning visit with Z.A., continually tested positive for cocaine, and reported relapsing just days before the final permanency review. Additionally, she continued to engage in numerous romantic relationships which could potentially expose Z.A. to harm. She lived with multiple different paramours and was reportedly engaged to at least three people since the case commenced. Thus, the record clearly shows that while Terence corrected the conditions that gave rise to the case and demonstrated he was committed to and capable of caring for all of

Z.A.'s needs, respondent continued to engage in the same conduct that led to Z.A.'s removal from her care.

¶ 37　　　　Nevertheless, respondent argues continuation of the wardship was in Z.A.'s best interests because (1) she had six months of therapy remaining and (2) termination of the wardship amounted to "*de facto* termination of contact between [respondent] and Z.A." We find these arguments meritless.

¶ 38　　　　First, ending court intervention does not equate to ending Z.A.'s therapy. Z.A. had been living with Terence since April 2019, and during that time, the caseworker indicated Terence consistently "show[ed] that he can care for all of [Z.A.'s] needs." In fact, it was Terence who enrolled Z.A. in the therapy sessions and ensured she attended. Thus, it is not unreasonable to believe Terence will continue to care for Z.A.'s needs without the need for court intervention.

¶ 39　　　　Second, while we recognize Z.A. was bonded to respondent and a child generally should, if possible, have a relationship with their biological parents, there is ample support in the record to conclude continuation of the wardship was not in Z.A.'s best interests. Respondent made no substantial progress toward reunification since Z.A. was taken into care, and there is no indication respondent will be able to care for her in the near future. See *D.L.*, 191 Ill. 2d at 13 ("[I]t is not in [the minor's] best interests for [her] status to remain in limbo for an extended period of time."). Moreover, Terence indicated he was willing to facilitate visitation once respondent received the treatment she needed.

¶ 40　　　　Accordingly, we conclude the trial court's decision to terminate the wardship and close the neglect case was not against the manifest weight of the evidence.

¶ 41　　　　　　　　　　　　　　　III. CONCLUSION

¶ 42　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 43          Affirmed.